IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBERT C. TRIPODI, JR. an individual and citizen of California<br>　　　　　Plaintiff,<br>v.<br>CAPITAL CONCEPTS, LLC, a Utah limited liability company; BLAIR S. ARNELL, an individual and citizen of Utah; NATHAN ARNELL, an individual and citizen of Utah; PRIME WEST JORDANELLE, LLC, a Utah limited liability company; PWJ HOLDINGS, a Utah limited liability company; NATHAN WELCH, an individual and citizen of Utah; OIL WELL PROPERIES, LLC, a Utah limited liability company; and JOHN DOES I-X.<br>　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER RE: NONDISCHARGEABILITY AND JUDGMENT ON THE PLEADINGS**<br><br>Case No. 2:09-CV-00071-CW<br><br>Judge Clark Waddoups |

## **INTRODUCTION**

Plaintiff Robert C. Tripodi, Jr. moved for an Order of Nondischargeablilty under 18 U.S.C. § 523(a)(19) against Defendant Nathan Welch on the default judgment entered against him for violating federal and state securities laws.[1] Welch opposed the motion and moved for reconsideration of the order denying his motion to set aside the entry of default, alternatively for an order setting aside the default judgment, and for judgment on the pleadings dismissing the claims.[2] Upon the completion of briefing the court heard oral argument on the motions and, from the bench, denied the motions to set aside entry

---

[1] Dkt. No. 124.

[2] Dkt. No. 126.

of default, but reserved ruling on the motion for an order of nondischargeability and for judgment on the pleadings.[3] Based on the oral argument, the court reserved ruling on the question of whether Tripodi had successfully pled that the notes at issue were securities. Upon further review of the pleadings, the arguments of the parties and the governing authorities, the court concludes that Tripodi has adequately pled a claim for state and federal securities violations and Welch's motion for failure to state a claim is denied. The court further concludes that the judgment for a securities violation is not dischargeable under 18 U.S.C. § 523(a)(19) and grants Tripodi's motion for an order of nondischargeability.

## FACTUAL BACKGROUND

In the course of developing the Talisman real estate project, Prime West Jordanelle, through Nathan Welch and other defendants, solicited funds from private lenders to assist in financing the project.[4] Welch was primarily responsible for securing debt financing for the project.[5] He pursued a strategy of seeking investment funds from private investors for use as seed money which he hoped to be able to ultimately consolidate with one or two large institutional lenders.[6]

A third party referred Tripodi to the Arnell Defendants[7] and told him that they might have high-yielding investment opportunities that would "mesh" with Tripodi's

---

[3] Dkt. No. 135.

[4] Dkt. No. 1, at 4.

[5] Dkt. No. 126, at iv.

[6] *Id.*

[7] The Arnell Defendants are defined in the Complaint as Capital Concepts, Blair S. Arnell and Nathan Arnell. Dkt. No. 1, ¶ 5.

2

retirement plans.[8] In early October 2006, Tripodi contacted the Arnell Defendants.[9] The Arnell Defendants then proceeded to solicit funds from Tripodi in "highly endorsed" opportunities which are the loans evidenced by the Promissory Notes at issue[10] and secured by the Deeds of Trust.[11] Tripodi eventually invested a total of one million dollars.[12] The investment was structured as the purchase and assignment of three Promissory Notes secured by Deeds of Trust and personally guaranteed by Welch. The transaction was completed in three phases.

First, on December 11, 2006, Welch, as the manager of Prime West Jordanelle, executed a Deed of Trust and Assignment of Rents in favor of Capital Concepts as beneficiary to secure an initial principal sum of two million dollars (the "First Deed of Trust"). Second, four days later, on December 15, 2006, Welch, as the manager of Prime West Jordanelle signed a Promissory Note promising to pay the face amount of $300,000 on December 15, 2007 to Capital Concepts (the "First Promissory Note"). The First Promissory Note was secured by the First Deed of Trust. On the same date, Capital Concepts sold and assigned the First Promissory Note to Tripodi for a payment of $300,000.[13]

Third, on January 11, 2007, Welch, as the manager of Prime West Jordanelle, signed another Promissory Note promising to pay the face amount of $400,000, due

---

[8] *Id.* at 10.

[9] Dkt. No 1, at 11.

[10] *Id.*

[11] Dkt. No. 1, at 4-9.

[12] *Id.*

[13] Dkt. No. 45, ¶ 20 and attached Ex. 3.

within 12 months, to Capital Concepts (the "Second Promissory Note"). The Second Promissory Note was also secured by the First Deed of Trust. In addition, on the same day, Welch, again as the manager of Prime West Jordanelle, signed a third Promissory Note promising to pay the face amount of $300,000, due within 12 months, to Capital Concepts (the "Third Promissory Note"). The Third Promissory Note was secured by a second Deed of Trust and Assignment of Rents (the "Second Deed of Trust") executed the same day by Welch as the manager of Prime West Jordanelle. On that same date, Capital Concepts sold and assigned the Second and Third Promissory Notes to Tripodi for payments totaling $700,000.[14]

Both Deeds of Trust recited that they would secure multiple promissory notes, not to exceed the principal sum of $9,125,000, which may be executed simultaneously and subsequently. Both Deeds of Trust encumbered the identical real property.[15] Both Deeds of Trust gave all secured notes equal lien priority, regardless of the execution date of each note.[16] All three Notes provided that the simple interest on the principal balance would be paid at the rate of 18% per annum and that in the event of default, the interest would accrue at a rate of 24% per annum until paid in full.[17] Welch personally guaranteed each of the three Promissory Notes.[18] Tripodi did not revise or negotiate the terms and

---

[14] Dkt. No. 45, ¶¶ 29, 43 and attached Exs. 5 and 8.

[15] Dkt. No. 1, at 8-9.

[16] Dkt. No. 45-2, and Dkt. No. 45-4.

[17] Dkt. No. 1, at 6-10.

[18] *Id.*

4

conditions for either Deed of Trust.[19]  Capital Concepts, and not Nathan Welch, handled this aspect.[20]

## ANALYSIS

**Determining if a Note Is a Security**

Welch argues, correctly, that a default judgment cannot be entered if the complaint fails to state a cause of action.[21]  His argument, however, that judgment on the pleadings should be entered in his favor because the Notes Tripodi purchased are not securities fails.  By statute a security is defined as "any note." 15 U.S.C. § 77b(1).  Nevertheless, notes that bear a "family resemblance" to a category of exceptions through four articulated factors are not considered to be securities.[22]  Whether a note is a security is a question of law[23] and, on motion for judgment on the pleadings, the court must draw all reasonable inferences in Welch's favor.[24]  Applying these standards[25] and, on application and balance of the factors articulated in *Reves*, the court finds that the factors weigh in favor of characterizing the Notes Tripodi purchased as securities.

The *Reves* analysis begins with the rebuttable presumption that a note is a security, unless it bears a strong resemblance to one of the categories of instruments identified by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche*

---

[19] Dkt. No. 1, at 6-10.

[20] Dkt. No. 1, at 19-20.

[21] *See, e.g., Soren v. Equable Ascent Fin., LLC,* 2012 U.S. Dist. LEXIS 84355 at *10 (D. Utah June 15, 2012); *Wantz v. Experian Info. Solutions*, 386 f.3d 829, 834 (7th Cir. 2004).

[22] *Reves v. Ernst & Young*, 494 U.S. 56 (1990).
[23] *S.E.C. v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013).

[24] *Id*. at 1162.

[25] In applying the factors the court considers the pleadings and the subsequent evidence the court required before entering judgment against Welch.

*Ross & Co.,* 544 F.2d 1126, 1137-38 (2d Cir. 1976).[26] These categories include a note delivered in consumer financing, a note secured by a mortgage on a home, a short-term note secured by a lien on a small business or some of its assets, a note evidencing a "character" loan to a bank customer, a short-term note secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.[27] The Tripodi Notes do not fall within any of these types.

If notes do not fall within a recognized exception, as in this case, the court must consider whether the notes bear a "family resemblance" to instruments that have been recognized to be non-securities. If a strong resemblance is not found, the court then must decide whether a new category should be added to the list on exceptions.[28]

In *Reves*, the Supreme Court devised a four factor test in determining whether the "family resemblance" of the note renders it a security.[29] These are factors and not elements that must each be met. They are intended as points of comparison which the court is to consider in applying a balancing test to determine whether the notes bear a "family resemblance" to those instruments on the list of exceptions.[30]

The four factors are: (1) the motivations of the buyer and seller for entering into the transaction; (2) the distribution plan for the instrument; (3) the reasonable

---

[26] *Reves*, 494 U.S. at 65-66, 110 S. Ct at 951.

[27] *Id.*

[28] *Carlucci v. Han*, 886 F. Supp. 2d 497, 513 (E.D. Va. 2012) (citing *Reves*, 494 U.S. at 67, 110 S. Ct. 945).

[29] *Reves,* 494 U.S. at 66, 110 S. Ct. 951.

[30] *Fox v. Dream Trust*, 743 F. Supp. 2d 389, 399 (D.N.J. 2010); *See Robyn Meredith, Inc. v. Levy,* 440 F. Supp. 2d 378, 384 (D.N.J. 2006).

expectations of the investing public; and (4) whether some factor exists that reduces the risk of the instrument.[31] In the present case, all factors weigh in favor of characterizing the notes at issue as securities.

**1.      Motivations of Buyer and Seller**

Under this factor, the court examines the transaction to assess the motivations that would prompt a reasonable buyer and seller to enter into it.  If the seller's interest is to raise money for general use of a business enterprise, or to finance substantial investments, and the buyer is interested primarily in the profit the note is expected to generate, then the character of the note tends toward it being a security.[32]  By contrast, if the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for cash flow problems, or to advance some other commercial or consumer purpose, the character of the note tends toward it not being a security.[33]

The purpose for the loan, as understood by the holder of the note, may inform as to the financial motivations for entering into the transaction. "The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)."[34]  This analysis includes consideration of the interest rate to be paid, a favorable rate indicating that profit was the primary goal of the lender.[35]  In *Pollack*, the investors obtained the notes through their investment advisors as part of an investment portfolio.  They were looking to invest in secure, conservative instruments.

---

[31]  *Reves,* 494 U.S. at 66, 110 S. Ct. 951.

[32]  *Id.*

[33]  *Id.*

[34]  *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994).

[35]  *Stoiber v. S.E.C.,* 161 F.3d 745, 750 (D.C. Cir. 1998).

7

That court found that most of the instruments that those investors would take positions in, such as investment grade commercial bonds, would have a fixed rate of return. The Second Circuit held that a fixed rate of return in that situation supported a presumption that the notes were securities.[36]

In *S.E.C. v. Thompson*, the court found that the record "contain[ed] substantial evidence that the holders understood that [the company] was investing their money, and not "correct[ing] for [its] cash-flow difficulties, or . . . advanc[ing] some other commercial or consumer purpose."[37] In that case, the prospective holders were motivated to participate after the defendant told them of the returns he was making, and so they loaned funds to his company. The investors were promised monthly returns of between three and five percent on the money they "loaned" the company.[38] The court held that the motivation factor supported a finding that the notes were securities because the attractive interest rate provided strong evidence that holders were "interested primarily in the profit the note [was] expected to generate."[39]

In this case, the motivation factor evident from the complaint tips in favor of the notes being securities. Tripodi was directed towards defendants because they may have high-yielding investment opportunities that would "mesh" with Tripodi's retirement plans.[40] The Promissory Notes provided interest ranging from 18% to 24%.[41] These facts

---

[36] *Pollack*, 27 F.3d at 813.

[37] *S.E.C. v. Thompson*, 732 F.3d 1151, 1163 (10th Cir. 2013).

[38] *Id*.

[39] *Id.* at 1162.

[40] Dkt. No. 1, at 10.
[41] Dkt. No. 1, at 6-10.

support a conclusion that Tripodi was motivated by investment reasons, not commercial lending ones.

The court is also required to consider the motivations of the seller. If the seller's primary purpose was to raise money for general business use, then that factor also weighs in favor of a note being a security.[42] Conversely, a short-term commercial loan used to remedy a cash-flow problem would weigh in favor of a note being a non-security.[43] In this case, the motivations of defendants in soliciting funds, as alleged in the complaint, are somewhat ambiguous. Tripodi alleges that defendants made misrepresentations in connection with the sale of the notes "to induce broad investment in Prime West Jordanelle through Capital Concepts."[44] The alleged misrepresentations involve, among others, statements about the projected success of the project, the high demand for the lots and the projected value the developed lots were expected to have.[45] The misrepresentations support that defendants were encouraging investments in notes the repayment of which would depend on the success of the project. These allegations all weigh in favor of the Tripodi Notes being securities.

Welch argues in his cross-motion that the purpose of the loan was to serve as a "bridge loan" to address short-term cash flow difficulties.[46] But Welch also asserts the ultimate goal was to "create enough balance sheet liquidity to attract long-term

---

[42] *Thompson*, 732 F.3d at 1162.

[43] *Fox v. Dream Trust*, 743 F. Supp. 2d at 397-98 (citing *Banco Espanol de Credito v. Security Pacific Nat. Bank,* 973 F.2d 51 (2d Cir.1992) ("It is well-settled that certificates evidencing loans by commercial banks to their customers for use in the customers' current operations are not securities.")).

[44] Dkt. No. 1, ¶ 137.

[45] Dkt. No. 1, ¶¶ 61.a through x.

[46] Dkt. No. 126, at 19.

funding."[47] These assertions, however, can carry no weight in the analysis. Welch defaulted and is barred from contesting the allegations of the complaint and from presenting additional evidence in support of his defense.[48] Moreover, the assertion at best allows an inference that the defendants were motivated by both general business purposes as well as short-term cash flow problems. This factor would not weigh so strongly in Welch's favor as to preclude the Notes from being securities.

On balance, the motivation factor weighs in favor of the Promissory Notes being securities. Investment opportunities through lucrative interest rates motivated Tripodi to engage in the transaction. Although Welch attempts to provide competing rationales for the motivation to solicit the Notes, he is barred by his default from asserting such facts and offering evidence to support them. The "motivation" factor favors *Reves'* presumption that the Notes are securities.

### 2. Plan of Distribution

The second *Reves* factor requires that the court analyze the plan of distribution of the notes at issue to determine whether they are instruments in which "there is common trading for speculation or investment."[49] The important factors are the size of the distribution, the sophistication of those taking part, and the negotiation process.

A large quantity of holders is not required to establish common trading for speculation or investment. Even a small number of holders is not dispositive in determining that a note is not a security, as a debt instrument may be distributed to but

---

[47] *Id.*

[48] *See, e.g. Olcott v. Del. Flood Co.,* 327 F.3d 1115, 1125 (10th Cir. 2003) ("Defendant by his default, admits the plaintiff's well-pleaded allegations of fact, is precluded from challenging those facts by the judgment, and is barred from contesting on appeal the facts thus established.") (quoting *Jackson v. FIE Corp,,* 302 F.3d 515, 525 (5th Cir. 2002)).

[49] *McNabb v. S.E.C.*, 298 F.3d 1126, 1132 (9th Cir. 2002) (quoting *Reves*, 494 U.S. at 66, 110 S. Ct. 951).

one investor, yet still be a security.[50] For example, in *McNabb*, the court noted that six customers in total did not constitute "a broad segment of the public."[51] Yet, when weighed with the fourth factor where unsophisticated buyers need the protection of federal securities laws, the lack of broad distribution was not dispositive.[52]

If notes are sold to a broad segment of the public, then "common trading" is established.[53] But it is not required that the notes be sold on an exchange.[54] Where a defendant puts no limitations on who can purchase the notes, offering them to any member of the general public who would make the investment, this factor weighs toward a finding that the instruments are securities.[55] In *Thompson*, while the initial holders were family and friends, Thompson later expanded distribution to anyone with $100,000 to invest.[56] The court noted that "an evident interest in widening the scope of distribution, combined with the broad availability of the notes can tip this factor strongly in favor" of classifying the note as a security.[57]

---

[50] *Trust Co. of La. v. N.N.P. Inc.*, 104 F.3d 1478, 1489 (5th Cir.1997) (citing *Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*, 768 F. Supp. 1010, 1015–16 (S.D.N.Y. 1991)); *Stoiber v. S.E.C.,* 161 F.3d 745, 751 (D.C. Cir. 1998) (holding that thirteen customers is not considered to be "a broad segment of the public", but because Stoiber solicited individuals, not sophisticated institutions, this factor was dispositive.)

[51] *McNabb v. S.E.C.*, 298 F.3d 1126, 1132 (9th Cir. 2002)

[52] *See Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1539 (10th Cir.1993*) (*notes sold to a sophisticated market, that were not purchased for any potential speculative or trading value, led to conclusion that no common trading occurred).

[53] *Reves*, 494 U.S. at 68, 110 S. Ct. 952.

[54] *Thompson*, 732 F.3d at 1164 (citing *Reves,* 494 U.S. at 66, 110 S. Ct. at 951).

[55] *S.E.C. v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002).

[56] *Thompson*, 732 F.3d at 1163.

[57] *Id.* at 1164 (citing *Wallenbrock,* 313 F.3d at 539).

In contrast, a plan of distribution tilts against notes being securities where the transaction was "unique, negotiated with a single buyer and negotiated term by term, rather than being offered in a wholesale or potentially wholesale fashion."[58] In *Robyn Meredith, Inc. v. Levy*, the court found that the nature of the note was a commercial transaction, and did not constitute a security, because "the note here was not issued to multiple parties, and neither party solicited the other in an attempt to raise money for general capital to trade commodities. The note was "nonnegotiable" and was "offered to a single party in connection with a specific commercial transaction." [59]

Here, the complaint does not expressly allege that the Promissory Notes at issue were sold to a broad segment of the public. Notably, however, the Trust Deeds were drafted before the Notes and were structured to allow broad distribution of notes, up to $9.125 million. Indeed, the Trust Deeds expressly contemplated multiple notes and investors by stating one note would not have priority over any other. Additionally, Tripodi alleges that defendants entered into an arrangement whereby the Arnell Defendants "would engage and solicit people and/or entities to lend money to Prime West Jordanelle for the development of the Talisman project."[60] It appears that defendants would have accepted any holders with sufficient funds to lend. Further, Tripodi is an individual, not a sophisticated institution. Finally, Tripodi did not revise or negotiate the terms and conditions for either Deed of Trust, which would be evidence of a traditional loan, not an investment.[61] All of these facts are consistent with a broad

---

[58] *Bass v. Janney Montgomery Scott, Inc.,* 210 F.3d 577, 585 (6th Cir. 2000).

[59] *Robyn Meredith, Inc. v. Levy,* 440 F. Supp. 2d 378, 386 (D.N.J. 2006).

[60] Dkt. No. 1 ¶¶ 19-21.

[61] Dkt. No. 1, pgs. 6-10.

investment plan, not a single commercial loan transaction. Under the facts as alleged, this factor also weights in favor of the Promissory Notes being securities.

**3.      Reasonable Expectations of the Investing Public.**

*Reves*' third factor requires that the court examine the reasonable expectations of the investing public and consider "instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction."[62] Under this factor, the actual motivations of the individuals involved are irrelevant. The court must view the transaction through the eyes of a reasonable investor, not the expectations of the specific individuals actually involved. "Reasonable public expectations will govern the characterization, even where the underlying economic realities belie those expectations."[63]

In applying this factor, the court is to consider whether the notes at issue would be reasonably viewed by purchasers as investments.[64] In *Thompson*, the defendant solicited funds to grow a reserve to fund a project.[65] The instrument expressly stated that it was not a security, and that it was not an investment program.[66] Nevertheless, the court held that the factor leaned slightly towards a characterization of the note as a security, stating that "[w]here the instruments are characterized by the originator as 'investments' and

---

[62] *Reves,* 494 U.S. at 66, 110 S. Ct. 945.

[63] *Bass*, 210 F.3d at 585 (citing *Reves*, 494 at U.S. 66–67, 110 S. Ct. 945); *McNabb v. S.E.C.,* 298 F.3d 1126, 1132 (9th Cir. 2002).

[64] *Thompson*, 732 F.3d at 1167.

[65] *Id.* at 1155.

[66] *Id*. at 1168.

there are no 'countervailing factors' that would lead a reasonable person to question this characterization, 'it would be reasonable for a prospective purchaser to take the [originator] at its word.'"[67]

In this case, Welch argues that defendants solicited funds to aid in securing longer-term financing.[68] Welch contends that he never considered the loans to be securities.[69] The argument fails. First, his perceptions are irrelevant to the analysis. The court must consider the reasonable expectations of the investing public in this scenario. Second, the court may not consider arguments and evidence submitted to avoid the default judgment. In the complaint, Tripodi alleges he was referred to the defendants specifically for "high-yielding investment opportunities."[70] Further, the defendants repeatedly emphasized the lucrative potential of the project, such as representing the overall value of the project as $200 million.[71] The structure of the Trust Deeds contemplated multiple investors and multiple notes all secured by the same property. These facts as alleged in the complaint lean decidedly in favor of finding that the Notes constitute securities.

**4.     Additional Factor Reducing Risk**

Finally, the court must consider whether some factor exists, such as the existence of a regulatory scheme, which significantly reduces the risk to the holder of the

---

[67] *Id.* at 1167 (quoting *Reves*, 494 U.S. at 69, 110 S. Ct. 945).

[68] Dkt. No. 126, at iv.

[69] Dkt. No. 126, at 20.

[70] Dkt. No. 1, at 10.
[71] Dkt. No. 1, at 12.

instrument, making the application of the Securities Acts unnecessary.[72] In this part of the analysis, the court must "assess whether there are adequate risk-reducing factors such as an alternate regulatory scheme that would 'significantly reduce[ ] the risk of the instrument' to the lender, 'thereby rendering application of the Securities Acts unnecessary.'" [73]

State regulations are a possible source of protection, but they do not necessarily offer sufficient protection to render the protection of the securities laws unnecessary. For example, the Second Circuit has held that a district court erred in concluding that state regulation of mortgages afforded protection sufficient to render unnecessary the application of the federal securities laws to these mortgage participations.[74] Further, in *Thompson*, the court held that holders were not adequately protected by the Utah State Securities Division and that this factor tilted in favor of a finding that the instruments at issue were securities.[75] Welch cites the court to no authority or facts that would suggest a different result in this case.

The existence of collateral, however, is a risk-reducing factor that may favor a finding that the instruments are not securities.[76] In this case, the Notes were secured by the Trust Deeds. Nevertheless, the specific facts pled do not support a conclusion that the existence of the collateral so significantly reduced the risk to Tripodi to ameliorate in

---

[72] *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1539 (10th Cir. 1993) ("The existence of other risk-reducing factors diminishes the need for protection under the Securities Act.").

[73] *McNabb v. S.E.C.,* 298 F.3d 1126, 1132 (9th Cir. 2002) (quoting *Reves,* 494 U.S. at 67, 110 S. Ct. 945) (citations omitted).

[74] *Pollack*, 27 F.3d at 815.
[75] *Thompson*, 732 F.3d at 1169.

[76] *Stone*, 998 F.2d at 1539; *Bass*, 210 F.3d at 585.

favor of the Notes not being securities. The Deeds of Trust were drafted to secure multiple notes up to $9.125 million, nine times the amount Tripodi was induced to invest. The Notes were included in a pool with no clear protection that the collateral would assure that Tripodi would be paid as promised. Moreover, every note secured by the Trust Deeds or to be secured in the subsequent sales of additional notes was afforded equal priority in the event of default and foreclosure.[77] All investors were on equal footing and there was no limit on the number of investors whose notes may have been secured by the same collateral. Thus, the collateral, in this case, provided at best limited security for the investors. The Notes bore the hallmarks of an investment scheme, structured to allow a broad range of investors, all on equal footing. In practical terms, the repayment of the loans represented by the Notes depended on the ultimate success of the project, not the credit worthiness of the borrowers or the value of the security. The fact that realization of the returns promised in the Notes was primarily dependent on the success of the venture favors strongly the conclusion that the Notes were securities.

In summary, all four of the *Reves* factors weigh in favor of the Notes Tripodi purchased being securities. As alleged in the complaint, Tripodi was induced by the defendants to participate in an investment scheme the success of which turned ultimately on the defendants being able to raise sufficient funds to proceed with the Talisman project. To realize the promised return on the investments, Tripodi was dependent upon the success of the defendants to raise additional long-term funding and develop a successful real estate project. The scheme contemplated multiple investors and provided limited protection that Tripodi would be paid on the Notes he purchased. Finally, Welch cites no factors that persuade that this particular investment has characteristics making it

---

[77] Dkt. No. 45-2, and Dkt. No. 45-4.

appropriate to be added to the excepted list of non-securities.  The Notes were sold to Tripodi as an investment and functioned in every practical sense as investment securities. Because the Notes were securities, the complaint states a cause of action for state and federal securities fraud and there is no legal basis to enter judgment on the pleadings in Welch's favor.

**Collateral Estoppel**

Welch's opposition to Tripodi's motion for an order of non-dischargeability also fails. The default judgment against Welch precludes him from having the debt discharged in bankruptcy. The analysis of whether a default judgment for securities fraud should have preclusive effect in a bankruptcy court so as to preclude discharge under 11 U.S.C. § 523(a)(19) turns on whether Congress preempted the common law of collateral estoppel by declaring non-dischargeable "any judgment" from where a debt arises for securities fraud.[78]  In *In re Pujdak*, the court concluded that Congress did preempt the common law requirements for collateral estoppel.  Thus, under § 523(a)(19) an issue need not be actually litigated to have preclusive effect.  Under common law collateral estoppel, a default judgment would normally not have preclusive effect because the issue would not have been actually litigated.  In *In re Pujdak*, the court reasoned that by passing § 523(a)(19) Congress intended to punish persons "who commit securities-related misdeeds by expanding the timeframe for the underlying judgment, settlement, order or decree to be entered."[79] That same Congressional intent extended to precluding such persons from having the benefit of the judgment being discharged in bankruptcy and relieving the

---

[78] *In re Pujdak*, 462 B.R. 560 (Bankr. D.S.C. 2011); *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994).

[79] *In re Pujdak,* 462 B.R. at 574.

victims from having to re-litigate the issue once judgment had been entered. The court reasoned that § 523(a)(19) expressly states that it applies to "any judgment" and that a default judgment falls within that language. The court further reasoned that a securities fraud default judgment should not be dischargeable once a defendant has had the chance to defend against the claim, and has chosen not to do so.[80] The *Pujdak* court concluded that a default judgment for securities fraud falls within § 523(a)(19) and is not dischargeable.[81]

In *Meyer v. Rigdon*,[82] the Seventh Circuit reached the same conclusion in considering provisions of 11 U.S.C. § 523(a)(11), which are analogous and parallel to the provisions of § 523(a)(19). In that case, the Court concluded "Congress wanted to expand the preclusive effect given certain prior actions in bankruptcy discharge exception proceedings." After explaining common law collateral estoppel principles, the Court concluded, "The plain language of section 523(a)(11), however, alters the common law collateral estoppel rules with respect to default judgments . . . [and] requires the bankruptcy court give preclusive effect to dispositions, like default judgments . . . ."[83] The Court further concluded that by enacting the provision Congress preempted common law principles of collateral estoppel.[84]

---

[80] *Id.* at 578.

[81] *Id.* at 560.

[82] *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994).
[83] *Id.* at 1380.

[84] *Id.*

The court finds the reasoning of *In re Pujdak* and *Meyer* persuasive.[85] Section 523(a)(19) limits the ability of a person found liable for securities fraud from avoiding the debt by having it discharged in bankruptcy. Congress intended by enacting the section to make it easier for victims to recover damages for securities fraud and to avoid having to retry an issue once a defendant has had a full and fair opportunity to defend against the claim and has elected not to do so. The section is applicable to "any judgment" and there is no indication in the language of the section nor in the circumstances of its adoption that a default judgment was not intended by Congress to fall within this language. The court holds that a default judgment for securities fraud falls within the provisions of § 523(a)(19).

In the prior default judgment entered against Defendant Welch, the court expressly stated it was based on securities fraud. Under § 523(a)(19), that judgment has preclusive effect and the debt is non-dischargeable.

## **CONCLUSION**

After applying the "family resemblance" test articulated in *Reves*, the court concludes the Promissory Notes were securities. Even construing all facts and inferences in favor of Welch, the analysis of the four factors confirms that the Notes do not resemble any of the articulated exceptions. On balance, all factors cut in favor of classifying the Notes as securities. The same analysis counsels against this court creating a new category of non-security to the Second Circuit's list articulated in *Reves*. This court holds that Defendant Welch cannot rebut the presumption that the Notes were securities.

---

[85] *McKinny v. Allison,* 2013 U.S. Dist. LEXIS 155245 (E.D. N.C. 2013) does not support a different result. In that case the judgment was entered upon a settlement agreement in which the defendant admitted no wrongdoing.

The court DENIES Defendant Welch's Motion for Reconsideration of Denial of Motion to Set Aside Entry of Default. The court DENIES Defendant Welch's Motion to Set Aside Default Judgment. The court DENIES Defendant Welch's Motion for Judgment on the Pleadings.[86]

The Court GRANTS Plaintiff Tripodi's Motion and enters an Order that the Default Judgment entered in this case in Tripodi's favor is not dischargeable in the bankruptcy proceeding.[87]

DATED this 30th day of June, 2014.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[86] *See* Dkt. No. 126 for these three motions.

[87] Dkt. No. 124.